**UNITED STATES of America, Plaintiff,**

v.

**PHILIP MORRIS INCORPORATED, et al., Defendants.**

**No. CIV.A.99–2496 GK.**

United States District Court, District of Columbia.

Sept. 28, 2000.

See also, 76 F.Supp.2d 5.

Sharon Eubanks, Department of Justice, Civil Division, Torts Branch, Washington, DC, for plaintiff.

Timothy M. Broas, Winston & Strawn, Washington, DC, Fred W. Reinke, Clifford, Chance, Rogers & Wells, Washington, DC, Michael A. Schlanger, Sonnenschein Nath & Rosenthal, Washington, DC, for defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

### I. *Introduction*

The United States of America ("the Government") seeks recovery of health care expenses under the Medical Care Recovery Act, 42 U.S.C. § 2651 *et seq.*, and the Medicare Secondary Payment provisions of the Social Security Act, 42 U.S.C. § 1395y, and disgorgement under the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961–1968, ("RICO") from nine companies[1] and two affiliated organizations[2] involved in the cigarette industry.

This matter is now before the Court upon the motion of one of the eleven Defendants, British American Tobacco Industries p.l.c. ("BAT Ind."), to dismiss the Government's complaint for lack of personal jurisdiction.[3] The Government argues that it is proper for this Court to exercise personal jurisdiction over BAT Ind. under

---

**1.** The nine corporate Defendants are: Philip Morris, Inc.; Philip Morris Companies, Inc.; Liggett Group, Inc.; R.J. Reynolds Tobacco Company; British American Tobacco Company; Brown & Williamson Tobacco Corporation; British American Tobacco Industries p.l.c.; Lorillard Tobacco Company, Inc.; and American Tobacco Company ("American Tobacco").

**2.** The two organizations are The Tobacco Institute and the Council for Tobacco Research (formerly known as the Tobacco Industry Research Committee).

**3.** BAT Ind. is the only defendant to contest personal jurisdiction. Defendants' joint motion to dismiss for failure to state a claim is addressed in a separate Memorandum Opinion issued the same day as this Opinion.

the District of Columbia Long–Arm Statute, D.C.Code § 13–423(a), while BAT Ind. responds that it has no minimum contacts with this forum and that this Court cannot exercise personal jurisdiction over it based on the actions of any other Defendant.

The Court has fully considered the parties' extensive filings, the representations of counsel in open court at oral argument, and the entire record. As more fully explained herein, the Court concludes that the Government has failed (1) to make the prima facie showing of a conspiracy between BAT Ind. and its subsidiaries B & W and BATCO or between BAT Ind. and its non-affiliated co-Defendants which would justify assertion of personal jurisdiction under the District of Columbia long-arm statute, and (2) to make the prima facie showing that BAT Ind. had those minimum contacts with the District of Columbia which constitutional due process requires. For these reasons, BAT Ind's Motion to Dismiss is **granted.**

## II. *Factual Background* [4]

▪▪▪ The history of BAT Ind. and its subsidiaries and co-Defendants, British American Tobacco Company ("BATCO") and Brown & Williamson Tobacco Corporation ("B & W"), is one of significant change over a period of 98 years. Each of the three corporations claims to have "scrupulously maintained all corporate formalities" throughout the transformations in their corporate structures and their relationships to each other. Affidavit of Philip M. Cook In Support of Defendant B.A.T. Industries p.l.c.'s Motion To Dismiss ("Cook Aff.") at ¶ 12.

BATCO, an English company that conducts tobacco-related research and owns subsidiaries which manufacture and market tobacco products, was incorporated in 1902. Reply Affidavit of Philip M. Cook In Support of Defendant B.A.T. Industries p.l.c.'s Motion To Dismiss ("Cook Reply Aff.") at ¶ 4. In 1927, BATCO acquired the stock of B & W, an American cigarette manufacturer, which "operated as a subsidiary directly or indirectly owned by" BATCO until 1979. *Id.*

In 1928, Tobacco Securities Trust Company Limited ("TST"), predecessor to BAT Ind., was incorporated as an investment company in England. Cook Aff. at ¶¶ 4–5. TST "never manufactured, marketed, packaged, sold, promoted, advertised or distributed tobacco products, or any other goods or products." Cook Aff. at ¶ 4. BATCO partially owned TST, while TST owned "approximately 0.21 percent of [BATCO'S] publicly held ordinary shares." *Id.* at ¶ 5. "No shareholder held a controlling interest in" BATCO before 1976. *Id.*

On July 23, 1976, TST changed its name to B.A.T. Industries Limited, which "became the sole ordinary shareholder of [BATCO]" in a "reverse takeover." "The former public shareholders of ordinary shares of [BATCO] became shareholders of [TST/B.A.T. Industries Limited]." *Id.* at ¶ 5. In 1979, BATCO went from being a

---

4. Ordinarily, for purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979). In determining whether a plaintiff has demonstrated that the defendant's contacts with the forum suffice to justify the exercise of personal jurisdiction, however, "the Court is no longer bound to treat all of plaintiff's allegations as true." *TIFA, Ltd. v. Republic of Ghana,* C.A. No. 99–1513, 1991 WL 179098, at *8 (D.D.C. Aug. 27, 1991) (*citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (1990), for the proposition that "[w]hen a court is considering a challenge to its jurisdiction over a defendant or a res, it may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts"). *Cf. Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1519 n. 1 (D.C.Cir.1984) (holding that on motions to dismiss for lack of subject matter jurisdiction, courts are not required to adopt plaintiffs' versions of controverted jurisdictional facts). This Factual Background section therefore includes material from the two affidavits of BAT Ind.'s company secretary, Philip M. Cook, based on his personal knowledge. It also includes material from the Proffer of Publicly Available Evidence submitted by the Government.

parent company of Brown & Williamson to being its sister company. *Id.* at ¶ 4. On July 8, 1981, B.A.T. Industries Limited changed its name to B.A.T. Industries p.l.c. ("BAT Ind."). *Id.* at ¶ 5. Since the reverse takeover, BAT Ind. has "been a holding company of both Brown & Williamson and [BATCO]." *Id.* at ¶ 4.

After the July 23, 1976, transaction and continuing until the present, BATCO has "continued its operations and continued to retain its separate corporate existence and identity," as has BAT Ind. *Id.* at ¶ 6. BAT Ind. remains an intermediate holding company of Brown & Williamson and BATCO; their ultimate parent company is British American Tobacco p.l.c.[5], which was created in September 1998. *Id.* at ¶ 9. Like its predecessor, TST, BAT Ind. "remains a holding company that does not manufacture, market, package, sell, promote, advertise or distribute tobacco products." *Id.*

### III. *Standard of Review*

To prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing of pertinent jurisdictional facts. *See Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C.Cir.1991); *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 787 (D.C.Cir.1983). A plaintiff makes such a showing by alleging specific acts connecting the defendant with the forum; mere allegations of a conspiracy will not suffice. *See Naartex* at 787.

In determining whether a basis for the exercise of personal jurisdiction exists, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. New York Zoological Soc.,* 894 F.2d 454, 456 (D.C.Cir.1990) (*citing Reuber v. United States,* 750 F.2d 1039, 1052 (D.C.Cir.1984)). In this case, the facts central to the Motion's disposition are not disputed. Indeed, the Government did not submit any reply to BAT Ind.'s Response to the Government's Proffer of Publicly Available Evidence ("Proffer" or "Prof.").

### IV. Discussion

The Government offers four separate rationales to justify the exercise of personal jurisdiction over BAT Ind. under the District of Columbia long-arm statute, two of which are based on conspiracy allegations. To prevail on this Motion, the Government must make a prima facie showing that under at least one of its rationales, BAT Ind. falls within the coverage of the long-arm statute, and that exercising jurisdiction over it in this case would not violate its due process rights. The Government has not made either showing.

### A. The Government Has Failed To Make A Prima Facie Showing Of A Conspiracy

The Government argues that BAT Ind. is subject to personal jurisdiction in the District of Columbia pursuant to the District of Columbia long-arm statute, D.C.Code § 13–423(a), based on the conspiracy theory of jurisdiction. The D.C. long-arm statute provides:

> [a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as

---

5. British American Tobacco p.l.c. owns a vast tobacco empire with global reach. The family of affiliated companies whose ultimate parent corporation is British American Tobacco p.l.c. is known as the BAT Group. *See* Prof. at 1, n. 2. This includes BAT Ind., BATCO, and B & W. British American Tobacco p.l.c.'s wholly-owned subsidiary, BAT Ind., itself owns hundreds of subsidiaries, predominantly manufacturers of tobacco products. Cook Aff. at ¶ 10. At the time that BAT Ind. acquired BATCO in 1976, BATCO owned tobacco-related subsidiaries "serving approximate-

ly 150 countries around the world," and there is no indication that these subsidiaries do not remain in the BAT Group or that British American Tobacco p.l.c. does not own other subsidiaries operating in additional countries. Cook Reply Aff. at ¶ 7. BAT Group affiliates own the leading cigarette brand in over thirty markets; in the United States, B & W is the third largest cigarette company. *See Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 99 (E.D.N.Y.2000). The BAT Group calls itself "the world's most international cigarette manufacturer." *Id.*

to a claim for relief arising from the person's (1) transacting any business in the District of Columbia;

\* \* \* \* \* \*

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C.Code § 13–423(a).

■ The conspiracy theory of jurisdiction provides that where a court has personal jurisdiction over the co-conspirator of a non-resident defendant, such as BAT Ind., due to overt acts committed by the co-conspirator in the forum in furtherance of the conspiracy, the co-conspirator is deemed the non-resident defendant's "agent" for purposes of the long-arm statute. *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1031 (D.C.Cir.1997). While conspiracy-based jurisdiction has been approved as a general principle in the District of Columbia, such approval has been given only in cases where the defendant has not contested the existence of the conspiracy. *See, e.g., Mandelkorn v. Patrick,* 359 F.Supp. 692, 695 (D.D.C.1973); *Dooley v. United Tech. Corp.,* 786 F.Supp. 65 (D.D.C.1992). However, by the same token, no District of Columbia court has ruled that conspiracy jurisdiction is unavailable in a factual setting where a defendant has contested the existence of a conspiracy. *See Eric T. v. National Med. Enterprises, Inc.,* 700 A.2d 749, 756 n. 12 (D.C.1997).

The Government asserts two distinct theories for the exercise of personal jurisdiction over BAT Ind. under a conspiracy-based argument. As its first theory, the Government argues that under D.C.Code § 13–423(a)(1), BAT Ind.'s co-conspirators transacted business in the District of Columbia and committed numerous overt acts in furtherance of the conspiracy in the District of Columbia. As its second theory, the Government argues that under D.C.Code § 13–423(a)(3), BAT Ind.'s co-conspirators committed tortious acts in the District of Columbia in furtherance of the conspiracy that caused tortious injury in the District of Columbia. As a threshold issue, the Government must first make a prima facie showing that BAT Ind. participated in the conspiracy.

■ To make such a showing, the Government must make a prima facie showing of all four elements of a civil conspiracy:

(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.

*Griva v. Davison,* 637 A.2d 830, 848 (D.C. 1994).

In addition, because the Government accuses BAT Ind. of participating in a conspiracy under RICO, an additional element is added to the above-cited definition of a common law civil conspiracy. Under RICO, each defendant must have committed "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The Government has failed to make a prima facie showing of the four elements of a civil conspiracy as well as the fifth element necessary to its claim that BAT Ind. participated in a RICO conspiracy either with the Defendants affiliated with it or with the non-affiliated Defendants, and thus cannot show that this Court has personal jurisdiction over BAT Ind. based on the existence of a conspiracy.[6]

6. Without substantial evidence that the defendant participated in a conspiracy aimed at a

forum, courts have tended to decline to exer-

## 1. The Government Has Failed To Make A Prima Facie Showing Of An Agreement In Fact With Its Affiliates

The Government argues that BAT Ind. conspired with Defendants B & W and BATCO, its subsidiaries. BAT Ind. responds that it is legally impossible for a parent corporation to conspire with its subsidiaries under RICO, and that even if it is legally possible, the Government has not made the necessary prima facie showing of an agreement here.

This Court need not reach the question of the legal possibility of a civil RICO conspiracy between a parent and its subsidiaries, because the Government has failed to make a prima facie showing that BAT Ind. entered into any agreement with B & W or BATCO.

### a. Statement Of Business Conduct

The Government contends that certain documents BAT Ind. distributed to B & W and BATCO demonstrate the existence of an agreement between the parent and its subsidiaries. In 1993 BAT Ind. issued a Statement of Business Conduct ("the Statement") to its subsidiaries that applied "to all directors, officers and employees of [BAT Ind.]." Prof. Ex. 76 at 1. The "principles" of the Statement applied "to all directors, officers and employees of every company within the B.A.T. Industries Group of Companies." *Id.* The Statement set forth two "prime" principles: "(i) observance of the laws in every jurisdiction in which B.A.T. Group companies operate

and (ii) in following that principle within the group, the observance of the highest standards of integrity in the conduct of our business activities." *Id.* at 2. The Statement, however, did "not purport to lay down detailed rules concerning all the topics which it covers. These will be for individual Operating Groups and companies to determine locally in the light of their own circumstances and their business environment." *Id.*

The Statement required certain officials to "make a report annually to the B.A.T. Industries Audit Committee concerning (i) general compliance with this Statement throughout the Group and (ii) specific circumstances of violation." *Id.* at 3.

The Statement incorporated a March 1984 document entitled "Legal Considerations on Smoking & Health Policy" ("the Legal Considerations document"). The Legal Considerations document instructed subsidiaries of BAT Ind. to be "factually and scientifically correct" in their "statements about cigarette smoking or the smoking and health issue." Prof. Ex. 61. The Legal Considerations document further stated that the "scientifically correct" position was that "[n]o conclusive evidence has been advanced and the statistical association does not amount to proof of cause and effect. Thus a genuine scientific controversy exists." Prof. Ex. 61.

The Government argues that the Statement of Business Conduct and the Legal Considerations document, when examined together, demonstrate "a conglomerate-wide, substantive position" that BAT Ind. imposed on its subsidiaries through a number of boards and oversight committees.[7]

cise jurisdiction. *See Dorman v. Thornburgh,* 740 F.Supp. 875, 878 (D.D.C.1990) (finding no conspiracy jurisdiction where alleged facts did not support conspiracy and noting that "this Court will not allow plaintiffs to assert the fiction of a conspiracy simply in order to establish personal jurisdiction over defendants who clearly have no contact or interest with the District of Columbia"); *Delgado v. Federal Bureau of Prisons,* 727 F.Supp. 24, 27 (D.D.C.1989 (no conspiracy jurisdiction where no injury occurred in the District of Columbia); *Hasenfus v. Corporate Air Servs.,* 700 F.Supp. 58, 62 (D.D.C.1988) disallowing conspiracy jurisdiction where claims were

"unsubstantiated"); *American Ass'n of Cruise Passengers v. Cunard Line, Ltd.,* 691 F.Supp. 379, 380 (D.D.C.1987) (holding that conspiracy jurisdiction cannot be upheld where the alleged co-conspirators "do contest their role in any conspiracy").

7. As examples, the Government mentions the Chairman's Policy Committee (later known as the Chief Executive's Committee) of the BAT Ind. Board; the Tobacco Strategy Review Team, which coordinated the activities of various tobacco operating companies but was not a committee of BAT Ind.; and some of the

Opp'n at 14–15. BAT Ind. contends that this argument is inaccurate. It emphasizes that rather than dictating a "party line," the Statement clearly directs individual companies to establish their own "detailed rules." Prof. Ex. 76 at 2. To illustrate its point, BAT Ind. points to the "Standards of Business Conduct" that B & W issued for itself. B & W's Standards "t[ook] into account the [BAT Ind.] principles," to which B & W "fully subscribe[d]." Moss Aff., Ex. T at 1.

These documents, whether viewed individually or cumulatively, simply do not constitute a prima facie showing that BAT Ind. had an agreement with its subsidiaries. At most, BAT Ind. was merely acting in its role as a holding company and sole shareholder by exercising a certain degree of influence over its subsidiaries to protect its investments.

> It is appropriate and necessary for a holding company in its role as sole shareholder to exercise a certain degree of influence over its subsidiaries thereby maximizing the holding company/shareholder's investment. . . . [BAT Ind.] exercised an appropriate degree of influence over certain decisions made by B & W, consistent with its holding company function and well within the norm.

Robert Stobaugh Aff. at ¶¶ 15, 17.

**b. Personnel Overlap**

The Government argues that many individuals worked successively or simultaneously for BAT Ind., B & W, and BATCO as directors, officers, and/or employees. Apparently the Government would have the Court infer from this factual scenario that BAT Ind. had an agreement with the two subsidiaries. It would stretch the chain of logic to the breaking point, however, to conclude that the mere fact that BAT Ind. and its subsidiaries had overlapping directorates and personnel demonstrates an agreement among the three entities to suppress unfavorable research, to not develop a safer cigarette, to perpetuate a public controversy about the health effects of smoking, or to market cigarettes to children.

Furthermore, it is far from clear that the Government's factual assertion of personnel overlap is even accurate. According to the Reply Affidavit of Philip M. Cook, BAT Ind.'s Company Secretary, to which the Government offered no substantive reply,

> [a]part from the brief transition period immediately after the July 23, 1976 transaction, there has been little overlap in membership of the [BATCO] board of directors and the [BAT Ind.] board of directors. Currently, only one person sits on the board of both companies. Similarly, the overlap between the [BAT Ind.] and Brown & Williamson boards of directors has been minimal and currently no member sits on both boards.

The Government itself acknowledges that there is another corporate layer standing between BAT Ind. and B & W, namely BATUS Holdings, Inc., a Delaware corporation, thus casting further doubt on the image of overlapping corporations with fuzzy borders. In sum, the Government has failed to make a prima facie showing of an agreement between BAT Ind. and either of the Defendants affiliated with it, BATCO and B & W.

**2. The Government Has Failed To Make A Prima Facie Showing Of A Civil Conspiracy Or A Pattern of Racketeering Activity**

The Government argues that BAT Ind. participated in the alleged conspiracy among all the non-affiliated Defendants, but does not support its argument with the necessary prima facie showing. Under RICO, a conspiracy consists of two or more acts of racketeering committed within a ten year period. 18 U.S.C. § 1961(2). Mail and wire fraud are both acts of racketeering. *Id.* at (1)(B).

Chairman's Advisory Conferences. *See* Opp'n at 14–15; Def.'s Response to Prof. at 8–17.

### a. The Holland Letter

The Government attempts to make a prima facie showing with a letter written in 1983 by BAT Ind.'s then-chairman, Sir Philip Sheehy, to Philip Morris, Inc., concerning the objections of the BAT Group's Dutch affiliate to an advertising campaign launched in Holland by Philip Morris–Holland B.V.[8] Sheehy wrote that the campaign, which implied that a brand of BAT Group cigarettes could harm smokers' health, made "a mockery of Industry cooperation on smoking and health issues" by using "the health issue to gain competitive advantage." Prof. Ex. 58. In a follow-up telephone conversation, BAT Ind. director Eric Albert Alfred Bruell told a Philip Morris official that it was "[e]ssential to ensure that in future no member of the Industry does anything similar." Prof. Ex. 59.

Sheehy's reference to industry cooperation, and his and Bruell's implications that one way the industry cooperated was by not stating publicly that another company's cigarettes could harm smokers' health, do suggest that an agreement existed between BAT Ind., Philip Morris, and other cigarette manufacturers. BAT Ind. argues that the Philip Morris advertising campaign appeared only in Holland, and therefore has no bearing on any alleged conspiracy to "perpetrat[e] an 'open controversy'" in the United States or to "deceive the American public about the health effects of smoking." Reply at 31. If the issues addressed in the letter were so geographically constrained, however, the BAT Group affiliate in Holland could have written to the Philip Morris affiliate in Holland about industry relations in that country. Instead, the chairman of BAT Ind., located in London, wrote to Philip Morris Inc., located in New York City. The involvement of high-level officials in the countries where the parent corporations were headquartered indicates that the "in-dustry cooperation" Sheehy referred to was international in scope.

Nevertheless, the Government cannot make a prima facie showing that BAT Ind. participated in a RICO conspiracy based on the Holland controversy alone. As noted above, the Government must show that BAT Ind. committed at least two acts of racketeering within ten years of each other. Therefore, even if BAT Ind. engaged in a racketeering act in this instance, the Government must make a prima facie showing that BAT Ind. committed another act of racketeering within ten years of September 9, 1983, the date the letter was written. The Government has failed to do so.

### b. The BAT Board Guidelines

The Government offers other examples of BAT Ind.'s alleged racketeering activity. First, the Complaint alleges that on April 14, 1982, BAT Ind. "knowingly cause[d] to be delivered by the United States mails" a letter addressed to a B & W official that "referenced materials regarding the 'BAT Board Guidelines' on public-affairs matters, and referred to enclosed 'secret' papers entitled 'Assumptions and Strategies of the Smoking Issues.'" Compl. at ¶ 55. Philip Cook attests in his affidavit that these documents were issued by the BATCO Board, not by BAT Ind., and the Government has not refuted his statement. *See* Cook Aff. at ¶ 31. BATCO and BAT Ind. are two separate entities with separate boards of directors; a document issued by BATCO cannot be attributed to BAT Ind.

### c. The Broughton Statement

Second, the Government alleges that BAT Ind. "transmitted in interstate commerce by means of the mails" the 1996 statement by BAT Ind. CEO Martin Broughton that BAT Ind. didn't conceal and had no internal research proving

---

8. The Complaint refers to Sheehy's letter as "Racketeering Act No. 59." Compl. App. at ¶ 59.

smoking causes disease or is addictive. Compl. App. at ¶ 101. *The Wall Street Journal* published that statement. Philip Cook attests in his affidavit that BAT Ind. did not transmit the "alleged" statements through the United States mails to *The Wall Street Journal.* Cook Aff. at ¶ 32. Rather, Broughton made the statements in person in London, where it was the media, not Broughton, which picked them up and disseminated them. Therefore the incident cannot be deemed to establish a prima facie case of mail fraud.

### d. The Imasco Research Project

The Government also points to the refusal of BAT Ind. to fund a research project at a BAT Group Canadian affiliate as evidence of the Defendant's participation in the alleged conspiracy. Imasco, a Canadian cigarette company that at the time was less than 50% owned by BAT Ind., asked other BAT Group companies to financially support its research on the development of a less hazardous cigarette. Prof. Ex. 257 at 28.

> [T]he BAT Group operating companies other than Imasco ... decided not to fund Imasco's research program on a group-wide basis. Their decision was not the product of direction from [BAT Ind.], but was a result of scientists at those operating companies concluding that the project was not well conceived from a scientific perspective.

Response to Prof. at 30. The Government argues that it was BAT Ind. alone that made the decision not to fund the Imasco project, and that it did so to suppress research into a less hazardous cigarette as agreed to by the co-conspirators. But the fact that BAT Ind. did not control its subsidiary's research decisions is highlighted by the fact that despite its failure to obtain the funding it sought, Imasco continued its research project with its own funds.[9] *Id.*

The Government alleges that BAT Ind. participated not only in a RICO conspiracy, but also in a civil conspiracy. It fails to make a prima facie showing of all four elements necessary to a claim of civil conspiracy for any one of the four incidents discussed above. In fact, the Government does not even allege any injury resulting from any one of these particular incidents. *See Griva*, 637 A.2d at 848. Thus the Government fails to make a prima facie showing of a RICO pattern of racketeering or of a civil conspiracy as to any of the four incidents discussed above.

### e. The Foundations Of The Conspiracy

In addition to its failure to show that BAT Ind. participated in two particular, specific acts of racketeering or in a civil conspiracy, the Government also fails to show that BAT Ind. participated in the creation and organization of the alleged conspiracy. The Government alleges that the conspiracy among Defendants was formed at a meeting in New York City on December 15, 1953. *See* Compl. at 15. As a result of that meeting, Defendants published a full-page advertisement called "A Frank Statement to Cigarette Smokers" in 448 American newspapers, which BAT Ind. did not sponsor or sign. Compl. at 17. The "Frank Statement" announced the establishment of The Tobacco Industry Research Committee ("TIRC"), predecessor of the Council for Tobacco Research ("CTR"), through which the cigarette companies "carr[ied] out their fraudulent course of conduct" by sponsoring and disseminating research that perpetuated an open controversy about the health effects of smoking. Compl. at 12. In 1958 some cigarette companies established the Tobacco Institute ("TI"), "a public relations organization whose function was to ensure that defendants' false and misleading positions on issues related to, among other things, the connection between smoking

---

9. Imasco may still be conducting this research. *See* Trans. Motion Hearing, June 14, 2000.

and disease, were kept constantly before the public, doctors, the press, and the government." Compl. at 21.

Significantly, BAT Ind. did not participate in the 1953 meeting, which is alleged to be the crucial organizational meeting of the conspiracy; BAT Ind. has never been a member of TIRC, which was created in 1954, or its successor CTR; and BAT Ind. has never been a member of TI, which was created in 1958. Indeed, BAT Ind. did not come into existence until 1976. On these facts it cannot be said that the Government has made a prima facie showing that BAT Ind. played any role in the original or early organizational activities of the conspiracy.

### f. Similar Conduct

The Government alleges that BAT Ind. "utilized the strategy and tactics of other defendants in this case, who had consistently promoted a false 'controversy' regarding the health risks of smoking." Prof. at 13–14. The Government also cites, as another example of BAT Ind. conduct that was similar to the conduct of the other conspirators, BAT Ind.'s suppression of Imasco's research just as other Defendants suppressed or refused to conduct any research into a safer cigarette. True or not, allegations that BAT Ind. acted similarly to its non-affiliated co-Defendants do not make a prima facie showing that BAT Ind. conspired with those Defendants. "Although parallel behavior may support an inference of conspiracy when the alleged co-conspirators have acted in a way inconsistent with independent pursuit of economic self-interest, that inference is warranted only when a theory of rational, independent action is less attractive than that of concerted action." *Federal Pre-*

scription Serv., Inc. v. American Pharm. Ass'n, 663 F.2d 253, 267 (D.C.Cir.1981); *see also Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 327 (D.C.Cir.1982) (holding that "[p]arallel business behavior alone ... is inadequate to create an inference of concerted action necessary to establish a Sherman Act [10] violation"). In short, the Government has not shown that parallel conduct by BAT Ind. gives rise, in this factual context, to an inference of conspiracy.

### B. The Government Has Not Made A Prima Facie Showing That BAT Ind. Has Minimum Contacts With The District Of Columbia

The Government suggests two theories for the exercise of personal jurisdiction under the District of Columbia long-arm statute that do not require a showing of a conspiracy. As its third theory,[11] the Government argues that under D.C.Code § 13–423(a)(1), BAT Ind. transacted business in the District of Columbia by buying and "maintain[ing] the viability" of cigarette brands formerly owned by the American Tobacco Company. Prof. at 55. As its fourth theory, the Government argues that under D.C.Code § 13–423(a)(4), BAT Ind. committed tortious acts [12] outside the District of Columbia that caused tortious injury in the District, from which it derives substantial revenue through the marketing and sale of cigarettes by its subsidiaries.

The Government's third theory offered in support of the exercise of personal jurisdiction cannot stand because the Government has not shown that BAT Ind. "transact[ed] any business in the District of Columbia," as D.C.Code § 13–423(a)(1)

---

10. There is no authority stating that parallel conduct alone could give rise to an inference of complicity in a RICO context, when it cannot suffice in an antitrust context.

11. The first and second theories were discussed in § IV.A., *supra.*

12. The acts the Government alleges include publicly denying that nicotine is addictive

though BAT Ind. knew the contrary to be true; controlling and directing research on cigarettes in order to perpetuate an "open controversy" regarding their safety; and suppressing the development of a less hazardous cigarette in order to minimize B & W's exposure to legal liability in the United States. *See* Opp'n at 36.

requires. The Government argues that in April 1995, BAT Ind. transacted business in the District of Columbia by acquiring and operating the American Tobacco Company's cigarette manufacturing facility in Reidsville, North Carolina, and selling its brands in the District of Columbia. *See* Prof. at 55–58. The Government alleges that BAT Ind. entered into a "judicially enforceable" Consent Order with the Federal Trade Commission ("FTC") to "maintain the viability of certain popular American Tobacco brands." *Id.* at 55. The FTC approved the acquisition of American Tobacco, the Government claims, only because BAT Ind. signed this agreement. After BAT Ind. acquired American Tobacco, according to the Government, it merged American Tobacco into B & W, although it remains obligated to make certain reports to the FTC under its agreement. *See* Prof. at 55–56.

BAT Ind. disputes the Government's account of the American Tobacco acquisition. According to the Cook Reply Affidavit, it was B & W and not BAT Ind. that acquired American Tobacco, managed its manufacturing facility, marketed its brands, and assumed its liabilities.[13] *See id.* at ¶ 21; Response to Prof. at 32–33. Cook attests that BAT Ind. never "manufacture[d], [sold], or distribute[d] cigarettes under [American Tobacco's] brand name in the District of Columbia, or anywhere else," and therefore there are no grounds for finding that it transacted business here. Cook Reply Aff. at ¶ 21. The Government has not rebutted the facts contained in these sworn declarations.

BAT Ind. is correct that its agreement with the FTC cannot form a theory for exercising jurisdiction because the agreement explicitly states that BAT Ind. consents to jurisdiction in the District of

Columbia "for purposes only of this agreement and any proceedings arising out of, or to enforce, this agreement." Prof. Ex. 76C at ¶ 4. Such explicitly limited consent cannot provide a basis for the exercise of specific jurisdiction here where the allegations of the conspiracy do not arise out of that stock purchase. *See Mallinckrodt v. Sonus Pharmaceuticals, Inc.*, 989 F.Supp. 265, 271 (D.D.C. 1998) (holding that defendant's previous contacts with a government agency could not support jurisdiction in an action that did not arise from the subject of the previous contacts).

 Furthermore, this Court cannot exercise personal jurisdiction over BAT Ind. under D.C.Code § 13–423(a)(4) because the exercise of such jurisdiction would violate due process, as discussed below, and the reach of the D.C. long-arm statute does not exceed the bounds of due process. "[S]ection 13–423(a)(1) is coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution." *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C.2000).

 The Government's fourth theory offered in support of the exercise of personal jurisdiction also fails, because the Government has not shown that BAT Ind. engages in business, derives substantial revenue, or engages in any persistent course of conduct in the District of Columbia, as required by D.C.Code § 13–423(a)(4).

 Even if the D.C. long-arm statute did permit this Court to exercise personal jurisdiction over BAT Ind. under the Government's fourth theory[14], the requirements of due process would prohibit it. The requirements of due process are satis-

---

**13.** It must be noted, once again, that the Government is not asking this Court to pierce the corporate veil to hold BAT Ind. accountable for B & W's actions regarding American Tobacco.

**14.** As discussed above, the long-arm statute cannot permit the exercise of personal juris-

diction under the Government's third theory because where the exercise of jurisdiction violates the requirements of due process, it is not permitted by the long-arm statute. This applies to the Government's first theory as well, which also relies on D.C.Code § 13–423(a)(1).

fied where the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted). To determine whether the exercise of personal jurisdiction over nonresident BAT Ind. satisfies *International Shoe*'s "traditional notions," this Court must consider two issues: first, whether BAT Ind. has "minimum contacts" with D.C., and second, whether exercising jurisdiction over BAT Ind. would be reasonable. The Government has failed to show that the exercise of personal jurisdiction over BAT Ind. in the District of Columbia would satisfy the requirements of due process.

The first inquiry examines BAT Ind.'s contacts with the District of Columbia. A defendant has minimum contacts with a jurisdiction when it has "purposefully directed [its] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotation marks omitted). If a defendant purposefully directed its activities towards a forum, it can expect to be subject to jurisdiction in that forum. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The Government has failed to make a prima facie showing that BAT Ind. has minimum contacts with the District of Columbia. As discussed above, the actions of other Defendants may not be attributed to it for purposes of exercising jurisdiction under a conspiracy theory, and BAT Ind.

itself has not purposefully directed its activities at this forum.

BAT Ind. exhibits none of the fundamental indicators of a company with activities in the District of Columbia. It is not licensed or qualified to transact business in the District of Columbia and does not do so. Cook Aff. at ¶ 13. It does not contract to supply services in the District of Columbia. *Id.* at ¶ 15. It does not maintain a representative or an agent for service of process in the District of Columbia. *Id.* at ¶¶ 14, 19. It does not have an interest in, use or possess any real property in the District of Columbia. *Id.* at ¶ 16. It has no bank account or telephone listing here, does not pay any taxes here, and has no office, place of business or mailing address here. *Id.* at ¶¶ 18, 19–21. It does not contract to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed in the District of Columbia. *Id.* at ¶ 17. *See also* Def.'s Mem. at 2–3.

In short, there is no evidence that BAT Ind. purposefully targeted its activities at residents of the District of Columbia, or even that it committed a single act within the District that has any nexus to the claims being asserted in the Complaint. *See Burger King Corp.*, 471 U.S. at 472–73, 105 S.Ct. 2174. The Government "fail[s] to show that [BAT Ind.'s] activities were expressly targeted at" the District of Columbia. *City and County of San Francisco v. Philip Morris*, No. C–96–2090, 1998 U.S. Dist. LEXIS 3056, at *15–16 (N.D.Cal. March 3, 1998). Therefore, exercising personal jurisdiction over BAT Ind. would violate the fundamental requirements of due process.[15]

---

**15.** Many other courts have considered the question of personal jurisdiction over BAT Ind. The overwhelming number of them have found that they did not have jurisdiction over BAT Ind. *See, e.g., Lyons v. Philip Morris, Inc.*, 225 F.3d 909 (8th Cir.2000); *Laborers Local 17 Health and Benefit Fund v. Philip Morris Inc.*, 26 F.Supp.2d 593 (S.D.N.Y.1998) (*rev'd on other grounds, Laborers Local 17 Health and Benefit Fund v. Philip Morris Inc.*, 172 F.3d 223 (2nd Cir.1999); *County of Cook v.*

*Philip Morris, Inc.*, No. 97–L–04550 (Ill. Cir. Ct. Cook Co.) (Neville, J.); *State of Hawaii v. Brown & Williamson Tobacco Corp.*, Civil No. 97–0441–01 (Haw.Cir.Ct.); *State of Indiana v. Philip Morris, Inc.*, No. 49D07–9702–CT–000236 (Ind.Super. Ct. Marion Co.); *State of California v. Philip Morris, Inc.*, No. 980864 (Cal.Super.Ct.); *State of Arizona v. American Tobacco Co.*, No. CV–96–14769 (Ariz.Super. Ct. Maricopa Co.); and *State of Nevada v. Philip Morris, Inc.*, No. 9700306 (Nev. Dist.

Because BAT Ind. has no minimum contacts with this forum, there is no need to proceed to the next step of the due process test to consider whether the exercise of jurisdiction would be reasonable. "A reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance, that is, if the constitutionally necessary first-tier minimum is lacking, the inquiry ends." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.1996) (*citing Donatelli v. National Hockey League*, 893 F.2d 459, 465 (1st Cir.1990)).

It is also unnecessary for this Court to reach the question of the constitutionality of conspiracy theory jurisdiction, as it is clear that whether or not it is constitutional in the abstract, there is no factual basis for relying on it in this case.

### V. *Conclusion*

Well established, sound policies support the existing legal principles which determine when a court should exercise personal jurisdiction and subject a non-resident defendant to the forum's law. In this changing world of globalization, where multi-national corporations extend their activities and influence to every corner of the earth, those principles may change or evolve to fit new realities. If so, that is a task for appellate courts and legislatures.

■ Because this Court has concluded, on the basis of those long-standing legal principles that the Government has not made a prima facie showing[16] that BAT Ind. participated in the conspiracy alleged in the Complaint or had minimum contacts with the District of Columbia, no basis exists for the exercise of personal jurisdiction. Defendant's Motion To Dismiss is **granted**. An Order will accompany this Opinion.

---

Ct. Washoe Co.). In addition, "[m]ore than 100 plaintiffs have voluntarily dismissed actions against" BAT Ind. Frawley Aff. at ¶ 3. It is true that many of these cases are distinguishable because different state long-arm statutes or state substantive conspiracy laws were applied, or different factual proffers were presented, but the trend of the case law is clearly against the exercise of jurisdiction over BAT Ind.

Nevertheless, some courts have found that they had jurisdiction over BAT Ind. *See, e.g., Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95 (E.D.N.Y.2000), and *Cannon v. B.A.T. Industries p.l.c., et al.*, No. C1–97–0368 (MS Cir. Ct., Jackson Cty., Apr. 17, 2000) (Harkey, J.).

16. The Government requested an opportunity to conduct jurisdictional discovery, pursuant to Fed.R.Civ.P. 56(f), in the event that the Court granted BAT Ind.'s motion. The Government submitted an exceptionally voluminous collection of exhibits with its Opposition, indicating that it already had ample opportunity to conduct jurisdictional discovery and is unlikely to uncover evidence of this Court's personal jurisdiction over BAT Ind. if given the opportunity. Moreover, as was discussed at oral argument, the Government chose (perhaps for budgetary reasons) not to go to England to examine the extensive document repositories located there. Finally, the Government has not made any detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce. *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C.Cir. 1983) (holding that it is not an abuse of discretion for a Court to deny a request for additional jurisdictional discovery where the party has already had ample opportunity to conduct discovery); *Caribbean Broad. Sys. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C.Cir.1998) (holding that "in order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant"); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C.Cir.2000) (holding that "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified"). Therefore, this Court denies the Government request to conduct additional jurisdictional discovery.