### In re: **MANAGED CARE LITIGATION**

**This Document Relates to Provider Track Cases**

**No. MDL 1334,
No. 00–1334–MD.**

United States District Court,
S.D. Florida,
Miami Division.

June 19, 2006.

*ORDER GRANTING SUMMARY JUDG-
MENT IN FAVOR OF REMAINING
DEFENDANTS UNITED AND COV-
ENTRY ON ALL CLAIMS*

MORE, District Judge.

## I. INTRODUCTION

Presently before the Court is the Omnibus Motion for Summary Judgment (D.E.

No. 3922)[1] filed by Defendants United Healthcare, Inc., United Health Group Inc., (collectively, "United") and Coventry Health Care, Inc. Since the Defendants filed their motion for summary judgment, the Court has provided the Plaintiffs with multiple opportunities to demonstrate a triable issue of fact regarding whether the Defendants conspired to defraud doctors by manipulating their claims processing systems. The Plaintiffs and Defendants have filed numerous briefs regarding conspiracy, and the Court has heard oral argument several times, most recently on March 14, 2006. As explained below, because no reasonable juror could return a verdict in the Plaintiffs' favor, the Defendants' motion for summary judgment is **GRANTED** as to all remaining claims.

In granting judgment in favor of the remaining defendants, this court is reminded of the Eleventh Circuit's opinion affirming class certification in this very case. See *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir.2004). The appellate court indicated that "[i]t would be unjust to allow corporations to engage in rampant and systematic wrongdoing, and then allow them to avoid a class action because the consequences of being held accountable for their misdeeds would be financially ruinous." *Klay*, 382 F.3d at 1274. As such, based on the allegations of conspiracy with each other to program their computer systems to systematically underpay the physicians for their services, the class

was certified. After reviewing thousands of documents, there simply is insufficient evidence of the wrongdoing claimed i.e. agreeing with their competitors to defraud the doctors. The evidence submitted here falls short of that needed to trigger the Racketeer Influenced and Corrupt Organizations Act's remedial scheme described as "the litigation equivalent of a thermonuclear device." See *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir. 1991). In so holding, the Court is not giving its *imprimatur* to the Defendants' actions or to the tremendous amounts of compensation received by their executives, described by some as exorbitant. But any reform related to executive compensation or individual practices by the health maintenance organizations is beyond the power of this Court. Those desiring changes in the way health care is provided in America must either look for remedies before Congress or allow the free market to dictate the results.[2]

## II. BACKGROUND [3]

The individual Plaintiffs represent a class of physicians who submitted fee-for-service claims to at least one of the Defendants or the alleged co-conspirator health maintenance organizations. See Third Amended Consolidated Class Action Complaint (D.E. No. 4661) at ¶¶ 54 [hereinafter TAC]. The individual physician Plaintiffs bring conspiracy and aiding and abetting claims, alleging that the Defendants have

---

1. After several former Defendants settled with the Plaintiffs, and after the Court granted summary judgment in favor of PacifiCare Health Systems, Inc., only Coventry and United remain as Defendants.

2. In that regard, the settlements with the other Defendants will undoubtedly cause the remaining Defendants to offer the physicians a similarly efficient and fair service in order to remain competitive, thus diluting their legal victory obtained by this order.

3. For a more detailed description of the factual and procedural background of this multidistrict litigation, which was originally transferred to this court on April 13, 2000, see the Eleventh Circuit's decision affirming in part this Court's initial class certification order, *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir.2004).

participated in a scheme to defraud doctors through the use of the Defendants' automated claims processing systems. *Id.* at ¶¶ 126–36. Additionally, the medical association Plaintiffs seek declaratory and injunctive relief on their own behalf and on behalf of their members. *Id.* at ¶¶ 2, 22.

To claim reimbursement for services, doctors complete a standardized form incorporating a "current procedural terminology" ("CPT") coding system through which medical procedures are identified by standardized designations. *Id.* at ¶ 59. These standardized designations consist of a base code identifying the procedure and modifiers indicating the degree of difficulty, complexity, and multiplicity. *Id.* at ¶¶ 59, 69. The doctors submit these forms containing CPT coded procedures to the insurers for payment. *Id.* at ¶ 58. The parties agree that CPT was originally intended to be a guide for reporting services, but they disagree over whether CPT is also the standard on which providers are reimbursed. While the Defendants maintain that CPT is only a guide for reporting, the Plaintiffs claim that "CPT *is* the standard on which providers are reimbursed, and the fees associated with CPT codes are supposed to take this into account." Plaintiffs' Response to Defendants' Omnibus Motion for Summary Judgment (D.E. No. 4076) at 6 [hereinafter Plaintiffs' Omnibus Response](emphasis in original and internal quotations omitted).

The Plaintiffs claim that the Defendants and alleged co-conspirator HMOs represented to physicians that they would pay for any covered, medically necessary services the physicians provided to insured patients in accordance with CPT. *Id.* at ¶¶ 54–56; Plaintiffs' Omnibus Response at 3. In short, according to the Plaintiffs, "[n]ot only is CPT the acknowledged industry standard for submission and payment for doctors' claims, but the Defen-

dants expressly represent that they will adjudicate physicians' claims in conformity with CPT, require doctors to bill using CPT and abiding by CPT protocols, and even represent to doctors that they use ClaimCheck to make certain that doctors claims are adjudicated in accordance with CPT." Plaintiffs' Omnibus Response at 3.

Once the doctors submit these payment requests, the Defendants and alleged co-conspirators use code editing software to process and edit the claims for payment. *Id.* An edit is logic that is applied to particular code combinations for purposes of reimbursement. *Id.* The Plaintiffs allege that the Defendants and other supposed co-conspirator HMOs, both on their own and as part of a common scheme, secretly use cost-based criteria unrelated to medical necessity in processing physician claims for payment, and, thus, contrary to their representations, they do not pay in accordance with CPT. TAC at ¶¶ 5, 63. The Plaintiffs claim that the Defendants and alleged co-conspirators agreed to defraud doctors by using the same or similar code processing systems to systematically underpay the Plaintiffs by denying, downcoding, and bundling the CPT codes the doctors submit and by refusing to recognize modifiers. *Id.* at ¶¶ 63–71; *see also* Joint Pretrial Stipulation (D.E. No. 3825) at 2 (Plaintiffs' Statement of the Case). Additionally, the Plaintiffs allege that the explanation of benefits forms the Defendants and alleged co-conspirators send to doctors to explain payment decisions misrepresent or conceal the actual manner in which they process payment requests. TAC at ¶¶ 72–74.

McKesson Corporation is the dominant source for code editing software in the healthcare industry. Plaintiffs' Omnibus Response at 3. McKesson markets several claim auditing products, including Claim-Check (also referred to as GMIS), Co-

deReview, Medicare CodeReview, and Patterns. *Id.* at 3–4. The parties agree that the Defendants and other supposed co-conspirator HMOs all licensed or used McKesson's editing products. *See, e.g.,* Plaintiffs' Supplemental Memorandum in Opposition to Summary Judgment (D.E. No. 4807) at 6 [hereinafter Plaintiffs' Supplemental Memorandum]; Tr. of March 14, 2006 Oral Argument at 16. Coventry and the alleged co-conspirator HMOs use ClaimCheck to process physicians' claims. Plaintiffs' Supplemental Memorandum at 6. United denies using ClaimCheck edits, but United did license ClaimCheck in late 1997. In any event, the Plaintiffs assert that even if United did not use Claim-Check to process claims, it modeled its own editing software on, and used virtually the same edits as, ClaimCheck. *Id.* at 6–8.

Beyond marketing claim editing software, the Plaintiffs assert that McKesson played a central role in the conspiracy to underpay doctors. *See, e.g.,* Tr. of March 14, 2006 Oral Argument at 16. Not only do Plaintiffs claim that the alleged conspiracy was facilitated by McKesson, but Plaintiffs describe McKesson as a co-conspirator, an agent of the Defendants, an intermediary, and the hub of the conspiracy. *See* Plaintiffs' Omnibus Response at 10; Tr. of March 14, 2006 Oral Argument at 16, 31, & 102.

According to the Plaintiffs, McKesson facilitated the conspiracy in several ways. The Plaintiffs allege that the Defendants and supposed co-conspirators were McKesson's key customers. Plaintiffs' Omnibus Response at 10. As key customers, the Plaintiffs assert that the Defendants and alleged co-conspirators participated on McKesson advisory committees through which they discussed edits and modifications of ClaimCheck and other McKesson products. *Id.* at 10–17; Plaintiffs' Supplemental Memorandum at 6. Al-

though the Plaintiffs present evidence that the Defendants and alleged co-conspirators also had opportunities to conspire at various conferences, focus groups, and forums, the Plaintiffs' briefs make clear that the McKesson advisory committees were the principal avenue through which the Defendants and supposed co-conspirators met and allegedly conspired. *See, e.g.,* Plaintiffs' Omnibus Response at 19–23. Given the central importance of McKesson to the alleged scheme, as Plaintiffs acknowledged at the most recent oral argument, much of their evidence of conspiracy comes from McKesson. Tr. of March 14, 2006 Oral Argument at 37.

In response to the alleged conspiracy and wrongful conduct of the Defendants and supposed co-conspirator HMOs, the Plaintiffs have brought this suit against the Defendants. In light of previous rulings regarding the arbitrability of physicians' direct claims against the insurers, the Plaintiffs rely on RICO conspiracy and aiding and abetting claims to impute liability to the remaining two Defendants (United and Coventry) for the conduct of the alleged co-conspirator HMOs.

With regard to these RICO-based claims, the Plaintiffs allege that the Defendants and supposed co-conspirators, along with third party entities (such as McKesson) that promulgate patient care guidelines and develop claims processing systems, constitute the Managed Care Enterprise ("MCE"). TAC at ¶ 89. According to the Plaintiffs, the Defendants and alleged co-conspirators "need a system that allows them to manipulate and control reimbursements to physicians and conceal the manner in which that is done. The MCE provides them with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme." *Id.* at ¶ 92. The Plaintiffs assert that the Defendants

and alleged co-conspirators, along with several third party entities, control and operate the MCE by developing generalized standards and patient care guidelines to systematically deny claims without regard to medical necessity of coverage, and by agreeing to use and using those guidelines to deny claims. *Id.* Further, the Plaintiffs assert that the Defendants and alleged co-conspirators, along with several other third-party entities (including McKesson), control and operate the MCE by developing automatic systems for editing and manipulating the CPT claims information submitted by doctors, and by agreeing to and using those systems to process claims and deny or diminish payment to the doctors. *Id.*

The Plaintiffs allege that the Defendants and supposed co-conspirator HMOs engaged in the predicate racketeering acts of mail and wire fraud when: (1) they sent by mail and wire the materials containing the misrepresentations described above with the intent to deceive the Plaintiffs and obtain their property, (2) they knew or recklessly disregarded the fact that the misrepresentations were material; (3) the Plaintiffs relied on the misrepresentations; and (4) the Defendants and co-conspirators obtained money and property belonging to the Plaintiffs. *Id.* at ¶¶ 96–102. Moreover, the Plaintiffs allege that the Defendants and supposed co-conspirators engaged in a pattern of racketeering activity by committing, and aiding and abetting in the commission of, numerous related acts of mail and wire fraud. *Id.* at 103. Through this pattern of racketeering activity, the Plaintiffs assert that the Defendants and alleged co-conspirators have conducted and participated in the affairs of the MCE in violation of 18 U.S.C.

§ 1962(c).[4] *Id.* at ¶¶ 106–07. The Plaintiffs assert that "each of the Defendants and Co–Conspirators agreed to participate, directly or indirectly, in the conduct of the affairs of the Managed Care Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud, wire fraud … and each Defendants so participated in violation of 18 U.S.C. § 1962(c)." *Id.* at 108–09. Thus, in Count I the Plaintiffs bring a claim for RICO conspiracy, as the Plaintiffs allege that this agreement violates 18 U.S.C. § 1962(d), which makes it unlawful to conspire to violate 18 U.S.C. § 1962(c). In Count II, the Plaintiffs bring a claim for aiding and abetting under 18 U.S.C. § 2, as the Plaintiffs assert that the Defendants and alleged co-conspirators aided and abetted each other in violating 18 U.S.C. § 1962(c). Finally, in Count III, the Plaintiffs seek declaratory and injunctive relief related to the RICO violations.

Earlier this year, the Court granted summary judgment in favor of Defendant PacifiCare, finding that the evidence proffered by the Plaintiffs was insufficient to allow a jury to reasonably conclude that PacifiCare conspired to systematically underpay doctors. In addition to granting summary judgment for PacifiCare, the Court set additional oral argument and allowed the Plaintiffs to file supplemental papers in opposition to the remaining Defendants' motion for summary judgment. The Court instructed the Plaintiffs that any additional briefing should cite specific parts of the evidence and demonstrate why the evidence of conspiracy was stronger against Coventry and United than it was against PacifiCare. The Plaintiffs filed their supplemental memorandum on Feb-

---

4. 18 U.S.C. § 1962(c) provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate of foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …."

ruary 17, 2006, United and Coventry each filed a response on March 3, 2006, and the Plaintiffs filed a reply on March 8, 2006.

## III. LEGAL STANDARD

Summary judgment is authorized where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant must present more than a scintilla of evidence in support of the non-movant's position. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## IV. RICO CONSPIRACY CLAIMS

Examining the evidence submitted by the parties and the numerous briefs on the issues, and after hearing oral argument, the Court concludes that the evidence proffered by the Plaintiffs is insufficient to allow a jury to find reasonably that the Defendants conspired to manipulate their claims processing software to systematically underpay doctors.

### A. Proving a Civil RICO Conspiracy Claim with Circumstantial Evidence of an Agreement

According to the Eleventh Circuit, "[a] civil RICO conspiracy claim requires a showing of the existence of a conspiracy, and the commission of an overt act in furtherance of the conspiracy that causes injury to the plaintiff." *Beck v. Prupis*, 162 F.3d 1090, 1098 (11th Cir. 1998), *aff'd*, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). Unlike in criminal cases, where the purpose of a conspiracy charge is to punish the agreement itself, the purpose of a conspiracy claim in civil cases is to impute liability. *See id.* at 1099 n. 18. Thus, a civil RICO conspiracy claim "allows persons who are responsible for an injury, but did not actually participate in the injury-causing activity, to be held liable." *Id.* at 1099. As mentioned above, given the various rulings regarding the arbitrability of direct provider claims, only conspiracy and aiding and abetting claims remain.

"A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997); *see also United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992). Here, the Plaintiffs allege an "overall objective" conspiracy. *See* Plaintiffs' Omnibus Response at 97. "The existence of the conspiracy agreement does not have to be

proven by direct evidence. Instead, it can be inferred from 'the conduct of the alleged participants or from circumstantial evidence of the scheme.'" *United States v. LeQuire,* 943 F.2d 1554, 1562 (11th Cir. 1991) (quoting *United States v. Ard,* 731 F.2d 718, 724 (11th Cir.1984)); *see also Republic of Panama,* 119 F.3d at 950. Here, as the Plaintiffs concede, they have presented "little or no direct evidence of conspiracy" and instead rely on circumstantial evidence of an agreement. Plaintiffs' Response at 95; *see also* Tr. of July 20, 2005 Oral Argument 78–79; Tr. of March 14, 2006 Oral Argument at 50. Regardless of the means, however, proof of the agreement is at the heart of a conspiracy claim. *See, e.g., Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1410 (11th Cir.1994); *In re Managed Care Litig.,* 298 F.Supp.2d 1259, 1281 (S.D.Fla. 2003).

To prove a conspiratorial agreement here, the Plaintiffs rely on evidence of parallel conduct by the Defendants and alleged co-conspirators. The Eleventh Circuit has provided guidance, in an antitrust context, on using evidence of parallel conduct to prove a conspiratorial agreement: "To ensure that we do not punish unilateral conduct, however, we require more than mere evidence of parallel conduct by competitors to support an inference of a conspiracy; an agreement is properly inferred from conscious parallelism only when 'plus factors' exist." *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1456 n. 30 (11th Cir.1991). "Plus factor" evidence is evidence that tends to exclude the competing inference that the defendants were acting independently. *Williamson Oil Co. v. Philip Morris USA,* 346 F.3d 1287, 1303 (11th Cir.2003). Plus factor evidence is often necessary in cases relying on evidence of parallel conduct to prove a conspiratorial agreement because, as the Supreme Court explained in *Matsu-*

*shita,* "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." 475 U.S. at 597 n. 21, 106 S.Ct. 1348. In other words, "equipoise is not enough to take the case to the jury." *Williamson Oil,* 346 F.3d at 1310.

■ Moreover, the Eleventh Circuit has recently confirmed that the standard set forth in *Matsushita* does not " 'introduce a special burden on plaintiffs facing summary judgment in antitrust cases.'" *Id.* at 1302 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)); *see also Eastman Kodak,* 504 U.S. at 468, 112 S.Ct. 2072 ("*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury."). Thus, a plaintiff relying on evidence of parallel conduct to show a conspiracy where the competing inference of independent action is just as likely must present additional evidence of conspiratorial behavior to survive summary judgment. This additional evidence, regardless of whether termed plus factors, "creates the requisite reasonable inference of conspiracy if it 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Williamson Oil,* 346 F.3d at 1303 (quoting *Matsushita,* 475 U.S. at 575, 106 S.Ct. 1348). Accordingly, although the Supreme Court's decision in *Matsushita* involved a price fixing conspiracy, its analysis of the standard for surviving summary judgment applies with equal force in other cases in which a plaintiff relies on evidence of parallel conduct to show a conspiratorial agreement.

■ Further demonstrating the universal applicability of the Supreme Court's analysis in *Matsushita,* numerous courts have applied the instructions from *Matsu-*

*shita* in non-antitrust cases. *See, e.g., Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir.1996) (citing *Matsushita* in a § 1983 case for the proposition that a court need not permit a case to go to a jury when the inferences upon which the non-movant relies are "implausible."); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1469–70 (9th Cir.1987) (applying *Matsushita* to a RICO claim); *Laro, Inc. v. Chase Manhattan Bank,* 866 F.Supp. 132, 137–38 (S.D.N.Y.1994) (examining RICO conspiracy claim, stating: "In *Matsushita,* the Supreme Court found that where defendants' behavior was consistent with other 'equally plausible explanations,' no inference of conspiracy arose. Certainly Laro has offered no evidence that 'tends to exclude the possibility' that defendants acted independently, as required by *Matsushita* in order to survive a motion for summary judgment."). Antitrust cases are particularly instructive in the civil RICO context because, as the Supreme Court has observed, "the civil action provision of RICO was patterned after the Clayton Act." *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 150, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Moreover, reference to antitrust cases is particularly appropriate here, considering the Plaintiffs' claims resemble those in a price-fixing case in many respects. Accordingly, where evidence of parallel conduct is as consistent with independent action as with conspiratorial behavior, a plaintiff must present additional evidence tending to exclude independent parallel behavior. *See, e.g., United States v. Philip Morris, Inc.,* 116 F.Supp.2d 116, 127 n. 10 (D.D.C.2000) ("There is no authority stating that parallel conduct alone could give rise to an inference of complicity in a RICO context, when it cannot suffice in an antitrust context."); *see also Williamson Oil,* 346 F.3d at 1303.

In their latest memoranda, the Plaintiffs argue that they do not need to present plus factor evidence because the parallel conduct they allege, mail and wire fraud, is itself unlawful. Thus, they assert that proving that the Defendants engaged in the parallel predicate acts of mail and wire fraud creates an unmistakable inference of an agreement to conspire. *See* Plaintiffs' Consolidated Reply to Coventry and United's Responses to Supplemental Memorandum in Opposition to Summary Judgment on the Issue of Conspiracy at 2 [hereinafter Plaintiffs' Supplemental Reply]. The Plaintiffs argue that, because "predicate acts are crimes, not conduct that can be mistaken for legitimate activities," the inference of an agreement to conspire from proving parallel predicate acts is a strong one. *Id.* Under the circumstances of this case, the Court disagrees, as regardless of the nature of the predicate acts, the Plaintiffs must show that the Defendants entered into an agreement. Alleged proof that the Defendants engaged in the predicate acts of mail and wire fraud is as consistent with independent behavior as with an industry wide conspiracy to manipulate claims processing systems. Therefore, the Plaintiffs must present additional evidence tending to exclude the possibility of independent conduct and tending to show conspiratorial behavior.

Importantly, the cases upon which the Plaintiffs rely do not address the use of evidence of parallel conduct to prove an agreement, and thus, they are of limited utility in evaluating the evidence in this case. For example, in *United States v. Elliott,* the court examined the sufficiency of the evidence supporting the defendants' RICO conspiracy convictions. 571 F.2d 880 (5th Cir.1978). The language cited by the Plaintiffs in their latest memorandum, when read in context, demonstrates that

the court in *Elliott* was discussing whether the government must prove that the defendants agreed personally to commit two or more predicate acts in furtherance of an enterprise for a conviction, not the effect of proving defendants committed parallel predicate acts:

> To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes.* One whose agreement with the members of an enterprise did not include this vital element cannot be convicted under the Act. Where, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable.

*Id.* at 903 (emphasis in original). The court's language and reversal of a conviction later in the opinion demonstrates that proof of an *agreement* to violate RICO is central to establishing a RICO conspiracy, regardless of proof that the defendant committed other crimes. Accordingly, even after noting that only slight evidence is required to connect a particular defendant to a conspiracy once the conspiracy has been established, the court nevertheless reversed the RICO conspiracy conviction of one of the defendants because the crimes he committed, although related to enterprise activity, were "insufficient to prove beyond a reasonable doubt that Elliot knowingly and intentionally joined the broad conspiracy to violate RICO." *Id.* at 907. Thus, similar to the Supreme Court's holding in *Matsushita* regarding reasonable inferences, the Fifth Circuit reversed the defendant's conviction because the

more reasonable conclusion was that he did not conspire to violate RICO. *Id.*

Similarly, in *United States v. Carter*, the Eleventh Circuit examined the decision in *Elliott* and clarified whether a defendant must agree to personally commit two or more predicate acts to be convicted:

> In summary, we hold that where the government's evidence establishes that a defendant agreed to participate in a conspiracy with a single objective, the requisite pattern of racketeering necessary to the objective of a RICO conspiracy is lacking. Only by demonstrating that the defendant agreed to personally commit two or more predicate acts is this lack cured.

721 F.2d 1514, 1531 (11th Cir.1984). Finally, in the one civil RICO conspiracy case the Plaintiffs cite, *Florida Software Systems, Inc. v. Columbia/HCA Healthcare Corp.*, the court did not address summary judgment standards at all, but rather denied a motion to dismiss, finding that the complaint sufficiently alleged that the defendant agreed to the overall objective of the conspiracy and agreed to commit at least two predicate acts. 46 F.Supp.2d 1276, 1284 (M.D.Fla.1999). This Court likewise denied a motion to dismiss and has further certified the class in this case. Now, however, the Court has to consider the actual evidence submitted. In any event, the Plaintiffs' cases do not stand for the proposition that proving parallel predicate acts results in an "unmistakable inference" of an agreement.

Moreover, in the criminal cases cited by the Plaintiffs, the government's proving that the defendants committed the predicate acts necessarily and objectively demonstrated agreement with the overall objective of the conspiracy, and thus, created a reasonable inference of agreement. Further, the government presented much additional evidence tying the defendants to

the overall schemes. In *United States v. Abbell*, for instance, the Eleventh Circuit reviewed the defendants' RICO conspiracy convictions arising out of laundering drug proceeds for the Cali Cartel and out of hindering the arrests and trials of drug traffickers. 271 F.3d 1286 (11th Cir.2001). The defendants would have no reason to commit the predicate acts in *Abbell*, various forms of obstruction of justice and money laundering, apart from furthering the overall drug conspiracy. Thus, proof that the defendants committed those acts led to the unmistakable conclusion that the defendants had agreed to participate in the overall conspiracy, as the inference that the defendants committed the acts independently would simply make no sense. For example, obtaining the false affidavits was necessarily connected to obstructing investigations and prosecutions for drug related activity. Thus, obtaining the false affidavits, when combined with other evidence presented by the government, objectively demonstrated an agreement by the defendant to participate in the conspiracy. Committing the predicate act of obtaining a false affidavit led to the reasonable inference of agreement because the act would make no sense unless related to some larger purpose, such as obstructing a prosecution. Moreover, in addition to proving the defendants committed several predicate acts, the government in *Abbell* presented substantial evidence showing that the defendants took on organizational roles in the scheme, that the defendants interacted with upper level players in the drug enterprise, and that the defendants knew the goals of their actions. Thus, when combined with this evidence, proof that the defendants committed numerous predicate acts unquestionably showed "an agreement to participate in the RICO conspiracy." *Id.* at 1300.

To prevail at trial here, the Plaintiffs must prove the Defendants agreed to participate in the affairs of the MCE through a pattern of racketeering activity. In this case, the alleged predicate acts are mail and wire fraud arising out of computerized claims processing in violation of CPT. Unlike the situation in *Abbell*, these acts are not necessarily in furtherance of a conspiracy, and absent evidence tending to exclude independent action, they do not lead to the unmistakable inference that the Defendants agreed to participate in the affairs of the MCE through a pattern of racketeering activity. Even assuming the actions of the Defendants amounted to wire and mail fraud, those acts still could have been in each individual Defendant's economic self interest. For example, the alleged claims processing in violation of CPT would have decreased costs and potentially increased profits. Each Defendant undoubtedly had an economic interest in decreasing physician costs. Consequently, the Defendants' allegedly parallel conduct is as easily explained by their theory of rational independent action as by the Plaintiffs' theory of concerted action, and thus, the concerns expressed in *Matsushita* about reasonable inferences apply with equal force here. Accordingly, just as the court stated in *Philip Morris*:

> True or not, allegations that BAT Ind. acted similarly to its non-affiliated co-Defendants do not make a prima facie showing that BAT Ind. conspired with those Defendants. "Although parallel behavior may support an inference of conspiracy when the alleged co-conspirators have acted in a way inconsistent with independent pursuit of economic self-interest, that inference is warranted only when a theory of rational, independent action is less attractive than that of concerted action."

116 F.Supp.2d at 127 (quoting *Fed'l Prescription Serv., Inc. v. American Pharm. Ass'n*, 663 F.2d 253, 267 (D.C.Cir.1981)).

In sum, even if the Plaintiffs could prove parallel conduct by the Defendants, no reasonable jury could infer, based solely on proof of the parallel conduct alleged here, that the Defendants entered into an agreement. Instead, even in a best case scenario for the Plaintiffs, the evidence would be in equipoise. As a result, consistent with the Supreme Court's holding in *Matsushita*, the Plaintiffs must present evidence tending to exclude the possibility that the Defendants acted independently and tending to show that they acted pursuant to an agreement.

**B. The Plaintiffs Cannot Demonstrate a Material Issue of Fact Regarding Defendants' Parallel Conduct**

■ In this case the Plaintiffs initially relied on Dr. Stephen Foreman, a "conspiratologist expert," whose testimony was excluded by the Court as unnecessary to analyze any incentive that a defendant would have in reducing payments to doctors. The Plaintiffs were still obligated to present fact witness testimony or documentary evidence supporting their conspiracy theory. The Plaintiffs' evidence is limited to the Defendants independently manipulating the software codes in the claims submitted by the doctors and reducing their payments; the Defendants' representatives attending trade association meetings where they had the "opportunity" to conspire; participating in McKesson's advisory committees; and the grotesquely exorbitant compensation received by the Defendants' executive officers.[5] This evidence is insufficient to prove either parallel conduct or the existence of a conspiracy.

Viewing the evidence proffered by the parties as a whole, the evidence is overwhelming that the Defendants and co-conspirators (as well as their subsidiaries) all adopted different editing practices at different points during the class period. Thus, the Plaintiffs cannot show that the Defendants and co-defendants developed and used the same claim processing system at the same time. *Cf.* Plaintiffs' Supplemental Reply at 16 ("[T]he fact that [Defendants] used different tricks at different times . . . or in different volumes, does nothing to negate this parallel conduct."). Recognizing this, the Plaintiffs make a much more general claim, arguing that the Defendants and co-conspirators entered "an agreement to conspire to defraud doctors by misrepresenting that they will be paid in accordance with CPT coding procedures while deploying claims processing systems that do otherwise." Plaintiffs' Supplemental Memorandum at 2.

■ Similarly, perhaps conceding that the evidence presented by the parties shows a lack of meaningful parallel conduct, the Plaintiffs argue that "the use of claims processing software that does the same thing but is not identical, the use of many but not all of the same offending edits, membership in some but not all of the organizations through which Defendants communicated, and attendance at some but not all of the same meetings [does not fall] short of what is required to prove an agreement to conspire." Plaintiffs' Supplemental Reply at 4–5. In support of their position, however, the Plaintiffs go even further, asserting, "one need not even have committed predicate acts, much less have committed the same kind of predicate acts" to be liable for conspiracy. *Id.* at 5. While this is a correct statement of law—once plaintiffs establish a conspiracy, co-conspirators need not en-

---

**5.** United Health Group's Chairman received over one billion dollars in compensation from 1996 to 2003; Coventry Health Care Inc.'s Chairman received nearly eighty million dollars during the same period.

gage in similar conduct to be held liable—it is inapplicable to this case. Here, the Plaintiffs rely on evidence of parallel conduct to establish the underlying conspiratorial agreement, not to tie a particular defendant to an already established conspiracy. Thus, the cases that the Plaintiffs cite, which discuss holding a person liable after a conspiratorial agreement has already been established, do not lend any insight into the evidence needed to establish the underlying conspiratorial agreement itself through proof of parallel conduct. While in general "one need not even have committed predicate acts, much less have committed the same kind of predicate acts" to be liable for conspiracy, in this case the Plaintiffs must show parallel conduct as the first step in proving an agreement. As explained further below, the Plaintiffs have failed to show an issue of material fact related to the Defendants' and supposed co-conspirators' alleged parallel conduct.

### 1. Evidence of Parallel Misrepresentations and Omissions

In attempting to show parallel conduct, the Plaintiffs first argue that the Defendants made "parallel express and implied representations and omissions with respect to paying doctors according to CPT coding procedures." Plaintiffs' Supplemental Reply at 6. Even looking at the Plaintiffs' best evidence of parallel misrepresentations, those documents do not demonstrate parallel behavior. For example, the Plaintiffs claim: "Both Coventry and United also make express, affirmative representations to doctors that they will be paid according to CPT coding procedures." *Id.* at 8. The quotes the Plaintiffs cite in support, however, demonstrate that the Defendants did not make parallel representations to physicians. The Plaintiffs assert that United misrepresented that it would pay according to CPT, but then quote from

United provider manuals stating explicitly that sources other than CPT may be used in determining reimbursement. *Id.* According to the Plaintiffs, "United, for example, says that it will pay 'in accordance with the methodologies in the most recent edition of CPT *or as reported by generally recognized professionals or publications.'*" *Id.* (quoting UHC–MDL 00203128) (emphasis added). Moreover, several United manuals do not indicate that payment will be exclusively in line with CPT, and further, they inform physicians that United will use automated claim processing logic: "All billed charges are subject to rebundling and other automated logic during the adjudication process. Any services or amounts not covered due to rebundling or other payment logic are not billable." *See, e.g.,* Defendants' Omnibus Motion for Summary Judgment at 27 (citing several United Physician and Provider Manuals from 1998 and 1999: UHC–MDL 00403669, UHC–MDL 00201802, UHC–MDL 00403182, & UHC–MDL 00203544). Indeed, a sampling of Defendants' and alleged co-conspirators' representations in provider manuals indicates little parallel behavior in the representations, and to the extent they engaged in any parallel representations, they generally indicated that CPT would not be the only guideline in determining reimbursement, contrary to the Plaintiffs' position. *See, e.g., id.* at 27–30 (quoting various documents provided to physicians).

With regard to representations made by Coventry, the Plaintiffs point to two documents, one from a Nebraska subsidiary and one from a Georgia subsidiary, which indicate that "[p]ayment of claims is made using CPT–4 guidelines" and that claims are processed "through a claim checking software product ... [that] evaluates the appropriate billing information and accuracy of CPT coding." Plaintiffs' Supplemen-

tal Reply at 8 (quoting CVTY 0019042 and CVTY 0018899). While Coventry refers to these documents as "needles in a haystack" when viewed in the context of the numerous documents it produced, even assuming these two representations indicate that payment will be in accordance with CPT, when compared to the representations of United and the alleged co-conspirators indicating that they may use sources other than CPT in determining reimbursement, the evidence the Plaintiffs cite demonstrates a lack of parallel behavior regarding the Defendants' and supposed co-conspirators' representations to doctors.

▮ As additional support for their contention that the Defendants and alleged co-conspirators engaged in parallel representations that doctors would be paid in accordance with CPT, the Plaintiffs point to the Defendants' requirement that doctors submit their claims according to CPT coding procedures as parallel evidence of fraud. As no party disputes that CPT codes are the industry standard for reporting (in contrast to payment) purposes, evidence that the Defendants required doctors to use CPT coding procedures in reporting does not demonstrate improper parallel behavior.

In sum, the Plaintiffs' evidence actually tends to show a *lack* of parallel behavior related to the Defendants' and alleged co-conspirators' representations to physicians. Thus, no reasonable jury could conclude that the Defendants and alleged co-conspirators engaged in parallel misrepresentations and omissions indicating that they would pay only in accordance with CPT.

### 2. Evidence of Parallel Conduct Related to Developing Claim Editing Software and Related to Claim Processing

Next, the Plaintiffs argue that the Defendants and alleged co-conspirators en-gaged in parallel conduct when they worked together to develop edits and when they used similar auditing practices to process claims that violated CPT. As already noted above, the Plaintiffs assert that McKesson is of central importance to the conspiracy, both as the facilitator for communication between the alleged co-conspirators and as the company marketing ClaimCheck. *See, e.g.,* Tr. of July 20, 2005 Oral Argument at 77–78 (As described by Plaintiffs' counsel, "the focus of this conspiracy is that these folks [the Defendants and alleged co-conspirators], through McKesson, . . . they used McKesson so they could use these computers to cheat doctors."). As the Plaintiffs explain further, "McKesson's customers were involved not only in the initial development of ClaimCheck, but also in the continual revision, enhancement, and updating of ClaimCheck." Plaintiffs' Supplemental Memorandum at 17–18. Thus, a large portion of the Plaintiffs' evidence of parallel conduct, and therefore of a conspiratorial agreement, relates to documents the Plaintiffs claim show that the Defendants and supposed co-conspirators played a large role in determining what edits should be included in ClaimCheck. *See, e.g., id.* at 17–26 and associated citations. Moreover, the Plaintiffs primarily focus on allegations related to ClaimCheck in attempting to show that the Defendants used nearly identical claim auditing systems to process doctors' claims in violation of CPT. *See, e.g., id.* at 5–8.

Looking at the best evidence cited by the Plaintiffs, because the evidence as a whole demonstrates conclusively that the Defendants and alleged co-conspirators used a variety of claims processing practices at various points during the class period, the Plaintiffs have failed to create a triable issue of fact regarding parallel behavior related to claim processing.

### a. Coventry

With regard to Coventry, the Plaintiffs have presented evidence that Coventry participated in several Claim-Check Advisory Committee meetings, and they have presented evidence that Coventry participated in a few other meetings or conferences that other alleged co-conspirators attended. However, as described at length in the Court's order granting summary judgment for PacifiCare, and as numerous other courts have observed, opportunities to conspire alone do not create an inference of an agreement. *See, e.g., Williamson Oil Co.*, 346 F.3d at 1319 ("Indeed, the opportunity to fix prices without any showing that appellees actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire."); *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 126 (3d Cir.1999) ("[C]ommunications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise.' " (quoting *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir.1994))); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir.1993) ("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred. A plaintiff must prove the defendants illegally conspired."). Beyond mere opportunities to conspire, the Eleventh Circuit has opined that even the exchange of pricing information among competitors is, by itself, an insufficient basis upon which to allow an inference of an agreement. *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1505 (11th Cir.1985) (price fixing case).

The Plaintiffs have not provided any direct evidence that Coventry formulated its claim auditing practices in concert with United or the other alleged co-conspirators. Coventry, on the other hand, has presented substantial evidence that each of its subsidiary health plans makes its own decisions regarding payment policies, that payment policies vary among its subsidiary plans, and that each health plan has its own ClaimCheck account to allow for customization at the subsidiary level. *See, e.g.*, Coventry's Supplemental Memorandum App., Exs. 8 & 10 (May 27, 2004 deposition of Cynthia M. Russell and May 16, 2003 deposition of Dr. Richard Gilfillan). Moreover, in contrast to the Plaintiffs' primarily generalized complaints about parallel claim processing, Coventry has presented specific examples of customization related to many of the primary edits about which Plaintiffs' complain. In particular, Coventry detailed its treatment of specific claims, showed how it processes claims differently than McKesson, and how its own subsidiary health plans process claims differently from each other. *See* Coventry's Supplemental Memorandum at 19–28. Thus, Coventry has presented substantial evidence that it did not engage in parallel claim processing with United or the alleged co-conspirators, and indeed, that its own plans did not even engage in parallel claims processing with each other.

Rather than addressing Coventry's specific evidence of independent action, the Plaintiffs respond, as they have previously, with generalized evidence tending to show that the Defendants and alleged co-conspirators do not process claims in conformity with CPT. *See* Plaintiffs' Supplemental Reply at 11–16. Even accepting that the Defendants did not process claims in line with CPT, however, the Plaintiffs' evidence still fails to create an issue of material fact regarding parallel claim processing. First, the Defendants and alleged co-conspirators have repeatedly conceded that they do not process claims according to

CPT, so that issue is not in dispute. Second, numerous government agencies do not process claims in accordance with CPT. Third, processing claims in ways that violate CPT is only wrongful if the Defendants defrauded the Plaintiffs. Fourth, even if Plaintiffs could prove that a Defendant defrauded physicians, given that only conspiracy and aiding and abetting claims remain, Plaintiffs must show parallel fraudulent conduct by the Defendants and alleged co-conspirators and additional evidence sufficient to create an inference of a conspiratorial agreement. Here, where the Defendants have presented substantial direct evidence showing independent decisions regarding their reimbursement policies, the Plaintiffs generalized claims that the Defendants all violated CPT fails to show parallel action. Thus, even accepting all of the Plaintiffs' premises, their conclusion is false:

> The bottom line with respect to parallel conduct in claims processing is that, without dispute, United and Coventry processed claims in ways that violate CPT. They, and the other Defendants, had a bag of software tricks they could use to accomplish this, and the fact that they used different tricks at different times—it has been well established that modifier recognition, for instance, could be switched on or off—or in different volumes, does nothing to negate this parallel conduct.

*Id.* at 16. On the contrary, in light of the Defendants' substantial evidence that they independently formulated reimbursement policies and customized their processing systems, and in light of the evidence that they used different claim processing software at different times, Plaintiffs have not established parallel conduct by simply showing that the Defendants processed claims in violation of CPT.

**b. United**

As to United's participation in the development of ClaimCheck edits, the Plaintiffs' evidence shows only that a United representative participated in one ClaimCheck advisory committee phone call. *See* United's Supplemental Response in Support of Motion for Summary Judgment (D.E. No. 4845) at 11 (citing Minutes of a February 18, 1998 ClaimCheck Advisory Committee conference call, CGPK 0139487–89); Plaintiffs' Supplemental Memorandum at 6 (citing same document). Given that this document indicates that a Mississippi Medicaid representative also participated on the call, and given that the Plaintiffs do not assert that any government entities were part of the conspiracy, this document falls far short of demonstrating conspiratorial behavior. The Plaintiffs do not point to any other evidence of conspiratorial behavior regarding this call, and the United representative present on the call, Diane Halseth, testified in her deposition that United did not enter into any agreements regarding reimbursement policies. *See* United's Supplemental Memorandum App., Ex. 1 (Sept. 21, 2003 deposition of Diane Halseth at p. 200). Other than this call, the Plaintiffs have not presented evidence tending to show that United participated in the development of ClaimCheck. Although the Plaintiffs present evidence that United representatives attended other meetings and conferences, as discussed above, that evidence shows, at best, that United had the opportunity to conspire. As a whole, the evidence conclusively shows no parallel conduct on the part of United related to the development of ClaimCheck.

Turning to claim processing, the evidence demonstrates, and Plaintiffs apparently concede, that United did not use ClaimCheck to process claims. *See, e.g.,* Tr. of March 14, 2006 Oral Argument at 13–16. Nevertheless, attempting to estab-

lish parallel conduct, the Plaintiffs maintain that, although United did not use ClaimCheck to process claims, United reviewed ClaimCheck in 1998 and incorporated the disputed edits into its own system, which Plaintiffs assert processed claims in essentially the same manner as ClaimCheck. *See, e.g.*, Plaintiffs' Supplemental Memorandum at 6–9. In support of their position, the Plaintiffs cite to the ClaimCheck Discrepancy Report, which they claim demonstrates that the authors recommended that United adopt some ClaimCheck logic into its own system. *See, e.g.*, UHCMDL 056401883–86. In response, United presented substantial testimonial evidence that its evaluation of ClaimCheck played no role in the development of its own claim processing system. *See, e.g.*, United's Supplemental Memorandum App., Ex. 1 (Feb. 20, 2004 deposition of Cynthia Athmann at pp. 202–05; May 20, 2004 deposition of Dr. Thomas Darr at p. 236; Feb. 27, 2004 deposition of Dr. Lee Newcomer at pp. 227–28). Further, United has presented evidence tending to show that its system processed claims differently than ClaimCheck. *See, e.g.*, Defendants' Supplemental Memorandum, Ex. 17. (noting decision to recognize certain modifiers in claim payment).

On its face, United's use of its own claim processing systems shows independent action rather than parallel conduct, and Plaintiffs fail to point to evidence creating an issue of material fact regarding whether United engaged in parallel claims processing. As they did with Coventry, Plaintiffs focus on showing that United processed claims in violations of CPT, an issue not in dispute, in an apparent attempt to show parallel conduct. For the same reasons discussed with regard to Coventry, this attempt fails to prove parallel conduct. Moreover, accepting Plaintiffs' theory that United incorporated ClaimCheck edits into its own system ac-

tually precludes a finding that United participated in the conspiracy as alleged by Plaintiffs. United's misappropriation of McKesson's ClaimCheck claim processing logic would obviously place United in an antagonistic position with regard to McKesson, the alleged hub of the conspiracy and alleged communication facilitator for the conspirators. Thus, after 1998, when Plaintiffs allege that United incorporated most of the ClaimCheck edits into its own system, United would likely not be able to engage in further conspiratorial behavior through McKesson. Accordingly, accepting Plaintiffs' argument leads to the inevitable conclusion that United acted independently and that United did not conspire with McKesson or the other alleged co-conspirators.

In conclusion, the Plaintiffs have failed to create an issue of material fact regarding parallel conduct by the Defendants and alleged co-conspirators.

## C. Even Assuming the Plaintiffs Could Demonstrate an Issue of Material Fact Regarding Parallel Conduct, Their Plus Factor Evidence Does Not Tend to Exclude Independent Action or Tend to Show Conspiratorial Behavior

Even assuming that the Plaintiffs could show that the Defendants engaged in parallel claims processing, they have presented insufficient evidence tending to exclude the possibility of independent conduct.

### 1. Motive to Reduce Physician Costs

The Plaintiffs first suggest that the Defendants and alleged co-conspirators had a motive to conspire so that they could reduce the amount being paid to physicians. *See* Plaintiffs' Supplemental Memorandum at 27. All for-profit corporations, however, have a motive to decrease costs and increase profits. In particular, managed care systems, by definition, seek to

reduce costs in the delivery of medical care. *See, e.g.,* Stedman's Medical Dictionary (27th ed. 2000) (Defining "managed care," stating: "Managed care organizations typically employ cost-containment measures such as emphasis on preventive medicine, audits of medical records, intensive review of claims, and punitive action against noncompliant providers."). Thus, evidence of a motive to decrease costs does not tend to exclude independent behavior and show concerted action. On the contrary, if present, evidence that the Defendants and alleged co-conspirators acted *against* their economic self interest could be probative of concerted action. Moreover, although the Plaintiffs point to the Defendants' savings from using claim processing systems, they do not connect the savings to the alleged conspiratorial conduct.

## 2. Conduct That Is Unreasonable in the Absence of a Conspiracy

■ Next, the Plaintiffs assert that, if only one of the insurers cheated doctors, then doctors would necessarily gravitate toward other non-cheating insurers. Thus, they argue that the Defendants' and alleged co-conspirators' cheating of doctors would be unreasonable in the absence of a conspiracy. *See* Plaintiffs' Supplemental Memorandum at 28–29. In support, the Plaintiffs largely rely on the expert opinion of Dr. Stephen Foreman, whose testimony the Court excluded several months ago as unhelpful to the jury. Nevertheless, looking at the substance of the Plaintiffs' claim and accepting Dr. Foreman's analysis, their argument is unconvincing because the Plaintiffs have not offered any evidence that all insurers are involved in the alleged conspiracy. Absent such evidence, Plaintiffs' argument fails because, as Dr. Foreman explained:

If no health insurer used the claim editing and pattern recognition software

and one insurer elected to do so for the first time on its own, competitors would expose the practice and hospitals and physicians would refuse to deal with that health insurer.

Only through collective action can the defendants maintain the improper "savings" system.

\* \* \* \* \* \*

[Non-cheating insurers would] have a strong incentive to enter the cheater's market, expose the illegal practice and take a portion of the monopoly rents by encouraging physicians and regulators to take action against the cheating firm.

Declaration of Stephen Foreman (D.E. No. 4072) at ¶¶ 51–52, 589.

Additionally, the Plaintiffs acknowledge that the Defendants used different claims processing systems at different times. As they describe it, Defendants "used different tricks at different times . . . or in different volumes." Plaintiffs' Supplemental Reply at 16. In light of this concession, the Plaintiffs have not explained why, in line with Dr. Foreman's analysis, doctors and competitors would not be inclined to gravitate to competitors who were either using "tricks" that were less harmful to doctors or in lower volumes than other insurers. In sum, the Plaintiffs' evidence and arguments on this point do not tend to exclude independent action.

## 3. Opportunities to Conspire

■ The Plaintiffs next point to the Defendants' and alleged co-conspirators' numerous opportunities to conspire as evidence of concerted action. *See* Plaintiffs' Supplemental Memorandum at 29–33. As this Court already held in the order granting summary judgment in favor of PacifiCare, and as noted above, proof that the Defendants and alleged co-conspirators had opportunities to conspire does not

alone permit an inference of conspiracy. Further, even assuming the Plaintiffs could prove parallel conduct, the fact that the Defendants and alleged co-conspirators had opportunities to conspire does not tend to exclude independent behavior, and thus, is insufficient to create an issue of material fact sufficient to preclude summary judgment. *See, e.g., Williamson Oil,* 346 F.3d at 1319 ("Indeed, the opportunity to fix prices without any showing that appellees actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire.").

### 4. Concealment

■ Next, the Plaintiffs point out that the Defendants do not disclose their claim processing logic, and they note that McKesson forbids the disclosure of edits in its licensing agreements. *See* Plaintiffs' Supplemental Memorandum at 33. Further, the Plaintiffs state that the Defendants attended meetings where they entered into confidentiality agreements. *Id.* According to the Plaintiffs, all of this amounts to efforts at concealment, which they claim supports an inference of conspiracy. *Id.* The fact that for-profit corporations would not disclose proprietary processing logic does not tend to exclude independent behavior. Similarly, evidence that the Defendants and alleged co-conspirators attended meetings at which they signed confidentiality agreements amounts to no more than evidence of opportunities to conspire, which, as discussed above, is insufficient to survive summary judgment.

### 5. Industry Performance and Irrational Market Phenomena

■ According to the Plaintiffs, the economic performance of the Defendants and alleged co-conspirators, including their profitability, as well as other market phenomena, cannot be explained in the absence of a conspiracy. and thus, they argue that this constitutes a plus factor. *Id.* at 34. Plaintiffs support this argument with data detailing the increasing profitability of the Defendants and alleged co-conspirators, the increasing salaries of their CEOs, the small increase in physicians' salaries as compared to those of other professionals, and the large number of mergers and acquisitions by the Defendants. *Id.* Even assuming all of the Plaintiffs' data is accurate, however, this evidence does not tend to exclude independent conduct. On the contrary, looking more closely at the data, the evidence demonstrates that the Defendants and alleged co-conspirators achieved their greatest profits at various times during the class period. Moreover, the evidence demonstrates that some of the Defendants and alleged co-conspirators were more profitable at the expense of others, others with whom they were supposedly conspiring. In total, the evidence does not tend to show concerted action, but actually lends more support to the Defendants' position.

### 6. Facilitating Practices

Finally, the Plaintiffs point to extensive trading of executives between the Defendants and alleged co-conspirators, merger discussions between the Defendants and alleged co-conspirators, and the Defendants and alleged co-conspirators overlapping ownership interests as additional plus factor evidence. This evidence, however, is just more evidence of opportunities to conspire, which, as discussed above, is insufficient to survive summary judgment.

Because the Plaintiffs have failed to proffer any evidence that would tend to show concerted action instead of independent action, their conspiracy claims cannot survive summary judgment.

## V. AIDING AND ABETTING CLAIMS

To hold a defendant liable under an aiding and abetting theory, a plaintiff must prove: "(1) that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provides the assistance; and (2) that the defendant knowingly and substantially assisted the principal violation." *Cox,* 17 F.3d at 1410.

> The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and abettor and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor, ... but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act ....

*United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980) (citations omitted).

The Defendants argue that, if the Plaintiffs' conspiracy claim fails, then so must their aiding and abetting claims. As noted in the order granting summary judgment in favor of PacifiCare, the Court agrees with the Defendants' analysis. The Plaintiffs' only aiding and abetting theory is that the Defendants substantially assisted one another by agreeing to engage in the same fraudulent scheme and conduct. Thus, because the Plaintiffs have not demonstrated an issue of material fact regarding the existence of an agreement, their aiding and abetting claims likewise cannot survive summary judgment because those claims depend upon demonstrating an agreement.

## VI. CONCLUSION

Because the Plaintiffs have not submitted evidence that would allow a jury to find reasonably that either United or Coventry was part of a conspiracy to underpay doctors or that either Defendant aided and abetted alleged RICO violations, summary judgment is GRANTED as to all remaining claims against the remaining Defendants.